UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KHALIL M. JACKSON,<br><br>Defendant. | CAUSE NO. 3:20-CR-76 DRL-MGG |

OPINION & ORDER

The government charged Khalil Jackson with sex trafficking of a minor, cyberstalking, and production, transportation, and possession of child pornography. Both sides filed motions for the trial beginning June 1, 2021. Khalil Jackson moved *in limine* on four issues: he seeks to exclude (1) all advertisements and photographs posted to the skipthegames.eu website, (2) all incoming text messages sent to his cellphones, (3) the proposed expert testimony of Kate Kimmer, and (4) records certified by Skip the Games, a Netherlands-based company hosting the skipthegames.eu website. The government filed a motion to permit the alleged victim in this case to be accompanied by a therapy dog while testifying. The court takes up these issues in sequence.

The court has broad discretion to rule on motions *in limine*. *Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002); *see also Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Evidentiary rulings ordinarily should not be made until trial when the court can resolve admissibility issues in their proper context. The court thus excludes evidence *in limine* only if it "is clearly inadmissible on all potential grounds." *Dartey v. Ford Motor Co.*, 104 F. Supp.2d 1017, 1020 (N.D. Ind. 2000) (citation omitted). If admissible on one ground or another, the court will defer ruling on admissibility until trial. *See id.* Even when the court grants a motion *in limine*, the order remains preliminary and subject to the court's revision at trial. *See Farfaras v. Citizens Bank & Trust of Chi.*, 433 F.3d 558, 565 (7th Cir. 2006).

  A. *The Court Denies Mr. Jackson's Request to Exclude a Representative Sample of the Skip the Games Advertisements and Photographs.*

Mr. Jackson seeks to prevent the government from introducing all photographs and advertisements posted to skipthegames.eu—an adult escort or prostitution website. The photographs depict the alleged victim, some clothed (though often with sexual overtones) and some nude. Rule 403 says the "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." The court must weigh "the need for and probative value of the evidence against potential harm that its admission might cause." *United States v. Miller*, 688 F.3d 322, 327 (7th Cir. 2012) (citation omitted).

The parties don't dispute that the photographs are probative of the alleged crimes. The advertisements and photographs (nude and non-nude) are probative of Mr. Jackson's alleged sex trafficking of a minor as charged in count 1. *See* 18 U.S.C. § 1591(a)(1). Though certain images were apparently taken by the victim and provided to Mr. Jackson, the government says Mr. Jackson posted them to skipthegames.eu. The photographs thus bear on the interstate commerce element (use of the internet); whether Mr. Jackson knowingly recruited, enticed, advertised, or maintained the victim for the purpose of sex trafficking; and whether Mr. Jackson was aware of or recklessly disregarded the victim's age. *See* Seventh Circuit Comm. on Fed. Crim. Jury Instrs., *18 U.S.C. § 1591 Sex Trafficking of a Minor—Elements*, *The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit* 646 (2020 ed.). The images, particularly one according to the government, likewise bear on the child pornography charges in counts 2, 3, and 4 because the victim was seventeen years old. *See* 18 U.S.C. §§ 2251(a), 2252(a)(1) and (a)(4)(B).

Mr. Jackson says the risk of unfair prejudice by introducing these images substantially outweighs their probative value under Rule 403. Unfair prejudice is "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid.

403 advis. comm. note. The court cannot say at this preliminary stage, outside the context of trial, that these advertisements or photographs are inadmissible on all grounds under Rule 403.

The non-nude images don't pose much risk of prejudice: the victim is clothed, though some photographs are more suggestive than others. The sexualized or pornographic images, albeit more inflammatory, aren't unfairly prejudicial on this preliminary record. The images are central to the charges here. All probative evidence is to some extent prejudicial, but that isn't the question; the question is whether the photographs are unfairly prejudicial. *See United States v. McKibbins*, 656 F.3d 707, 712 (7th Cir. 2011). To introduce the photographs that Mr. Jackson allegedly posted, at least a representative sample, is by no means unfair. *See, e.g., United States v. Hatfield*, 358 F. Appx. 692, 696 (7th Cir. 2009) (allowing 12 child pornography videos into trial when they "were central to the charged conduct," even while acknowledging they were prejudicial); *United States v. Sewell*, 457 F.3d 841, 844 (8th Cir. 2006) (district court erred by refusing to permit government to publish representative sample of child pornography images found on defendant's computers).

Our law's longstanding tradition also supports using photographs at trial. The "prosecution is entitled to prove its case by evidence of its own choice," and "a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." *Old Chief v. United States*, 519 U.S. 172, 186-87 (1997). There are sound reasons for this tradition. It not only permits the government to meet the formal definition of an offense, but also enables the government to tell a "colorful story" of the offense with "descriptive richness." *Id.* at 187. As here, evidence may probe multiple elements of a crime or even multiple crimes. *Id.* A full record of the evidence signifies the law's moral underpinnings and emphasizes to the jury its obligation to sit in judgment. *Id.* at 187-88. A fuller record reinforces that the alleged offense is more than mere black letter law; it involves real people and real events. *See, e.g., Hatfield*, 358 F. Appx. at 696 (permitting child pornography videos to be shown to the jury even when defendant wanted to stipulate because

3

"stipulations generally cannot substitute for the government's chosen evidence"). Mr. Jackson's proposed alternative—having witnesses describe the photographs—isn't sufficient for these reasons.

Mr. Jackson next says the images will confuse the jury and will prove needlessly cumulative. He says an array of images will improperly suggest to the jury that Mr. Jackson took the photographs when many were taken and provided by the alleged victim. That issue can be explored during direct and crossexamination to the extent that the parties deem it material, not least to the child pornography production charge in count 2. Any risk of confusion is slight at best, without outweighing the probative value of these images.

Evidence is needlessly cumulative "when it adds very little to the probative force of the other evidence in the case, so that if it were admitted its contribution to the determination of truth would be outweighed by its contribution to the length of the trial, with all the potential for confusion, as well as prejudice to other litigants, who must wait longer for their trial, that a long trial creates." *United States v. Gardner*, 211 F.3d 1049, 1055 (7th Cir. 2000) (citation omitted). The court cannot say at this preliminary stage that the photographs—at least those intended to be used by the government—are so needlessly cumulative to outweigh their probative value substantially.

The government says Mr. Jackson posted 400 advertisements to the website with the alleged victim's images, but the government stops short of saying it intends to introduce them all and refers the court to a representative redacted sample. Only the context of trial will tell. If the government seeks to introduce more than a representative sample of photographs, particularly noting that the photographs are often replicated among advertisements, their probative value may decrease, and the risk that the jury will infer guilt improperly on the sheer number of photographs may grow. Permitting the government to publish a representative sample is one thing; publishing them all is quite another. *See Sewell*, 457 F.3d at 844. At the same time, prohibiting them all outside the context of trial is

improper when they aren't inadmissible on all grounds. *See Dartey*, 104 F. Supp.2d at 1020. The court denies Mr. Jackson's request to exclude a representative sample of photographs *in limine* before trial.

      B.      *The Court Denies Mr. Jackson's Request to Exclude the Incoming Texts.*

Mr. Jackson next seeks to exclude all incoming text messages received on two cellphones as hearsay. The government says Mr. Jackson texted customers while impersonating the victim. The government wants to use his texts as evidence that he was sex trafficking a minor. Mr. Jackson doesn't contest that his outgoing texts aren't hearsay, and rightly so. *See* Fed. R. Evid. 801(d)(2)(A) (opposing party's statement); *United States v. Lewisbey*, 843 F.3d 653, 658 (7th Cir. 2016). The only issue is whether the texts he received from prospective customers are inadmissible hearsay.

Hearsay is generally inadmissible at trial. Fed. R. Evid. 802. Hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). On this record, the incoming texts aren't being offered for their truth, just to provide context for the outgoing messages. *See Lewisbey*, 843 F.3d at 658. For instance, the incoming customer's text that "Yes, I have my own place" isn't being offered to prove that the customer actually had his own place, but to provide context for the alleged trafficking that occurred. Likewise, the incoming customer's text that a certain address was his place isn't being offered to prove that this location is his actual address, but again to place into context the defendant's alleged trafficking, and his state of mind in allegedly "selling" the alleged victim to others. *See id.* The court denies the request to exclude these incoming texts *in limine*.

      C.      *The Court Denies Mr. Jackson's Request to Exclude Kate Kimmer's Proposed Expert Testimony as Unhelpful and Prejudicial.*

The government designated for trial the anticipated opinion testimony of Kate Kimmer. With a master's degree from the International Christian University Graduate School of Public Policy and Social Research, Ms. Kimmer intends to testify about the "cycle of force, fear, and coercion that distinguishes human trafficking from prostitution." She will explain how victims of human trafficking

5

become involved in such activities; the relationship between a victim and trafficker; the psychological, biological, and sociological components forming the "trauma bonding relationship" between a victim and trafficker, including how the trafficker may use psychological tactics, like isolating a victim from family members, physically abusing the victim, or depriving a victim of basic needs, to continue his exploitation; how this exploitation takes place within a criminal enterprise and how it becomes an economic activity for the trafficked victim; and that it isn't unusual for trafficking victims to prostitute to earn money because they have no other means of self-preservation.

Expert opinions must be reliable and helpful. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Appreciating that trial instructions tell jurors to weigh opinion testimony the same as that of ordinary fact witnesses, *see, e.g.,* Seventh Circuit Comm. on Fed. Crim. Jury Instrs. 3.13 (2020), an expert nonetheless enjoys considerable latitude when testifying, *see* Fed. R. Evid. 702-704, and jurors often tend to heed that testimony because of the expert's aura of authority and knowledge, *United States v. Jett*, 908 F.3d 252, 267 (7th Cir. 2018). So the court gatekeeps beforehand. The court decides the testimony's reliability and fitness before the jury ever hears it. *Daubert*, 509 U.S. at 594. This duty extends to all proposed expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

A witness may testify in the form of an expert opinion when (1) the witness is "qualified as an expert by knowledge, skill, expertise, training, or education," (2) the testimony is "based on sufficient facts or data," (3) the testimony is "the product of reliable principles and methods," and (4) the witness has "reliably applied the principles and methods to the facts of the case" in such a way that the testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The analysis remains at all times flexible, *Daubert*, 509 U.S. at 594, though these fundamentals at the start can be restated formulaically just for ease of understanding:

*Opinion + Qualifications + Facts + Validation + Fit = Admissible Expert Testimony.*

*See Constructora Mi Casita v. NIBCO, Inc.*, 448 F. Supp.3d 965, 970 (N.D. Ind. 2020) (Leichty, J.). The proponent of expert testimony must establish its admissibility by a preponderance of the evidence. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019).

Mr. Jackson moves to exclude this proposed expert testimony. He says Ms. Kimmer's testimony is irrelevant and unhelpful to the jury, or alternatively that the danger of unfair prejudice substantially outweighs its probative value. *See* Fed. R. Evid. 401-403, 702; *Daubert*, 509 U.S. at 593.

Mr. Jackson targets first the unhelpfulness of the proposed expert testimony. Expert opinion must fit the case. Opinions must be tied to case facts and issues. *Kumho Tire*, 526 U.S. at 150. The opinion must help the jury decide an issue of consequence. Expert testimony that "does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. A court should exclude testimony unless it speaks, without confusing or misleading the jury, on a relevant issue that the jury must decide. *See* Fed. R. Evid. 403 and 702; *see, e.g.*, *Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 819 (7th Cir. 2014); *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 897 (7th Cir. 2011). This is what is commonly called fit. *See Daubert*, 509 U.S. at 591.

The second superseding indictment requires the government to prove in count 1 that Mr. Jackson knew or recklessly disregarded that force, threats of force, fraud, coercion, or any combination of such means would be used to cause the alleged victim to engage in a commercial sex act. The government expects the alleged victim to testify that Mr. Jackson used physical and psychological force to induce her into having commercial sex. The government expects her to say she endured beatings and druggings, and that Mr. Jackson controlled her finances and that she became dependent on him as a result. The proposed testimony is helpful here because it enables the jury to assess the alleged victim's credibility, to understand the concepts and dynamics of exploitation and trafficking invariably foreign to the jury's experience, to decide whether the alleged victim acted voluntarily or under coercion, and to evaluate whether the alleged victim's experience was typical or implausible.

7

The helpfulness of expert testimony is case specific, but a brief survey of cases couches the point. This circuit recently affirmed use of expert testimony to explain common sex trafficking dynamics and define key terms for a sex trafficking prosecution because it was reliable and helpful to the jury, *see United States v. Young*, 955 F.3d 608, 615-16 (7th Cir. 2020), to explain how a sexually abused victim exhibited behaviors like other victims of domestic violence to help the jury determine whether to credit the victim's testimony, *see United States v. Young*, 316 F.3d 649, 656-59 (7th Cir. 2002), and to explain a child molester's methods to attract and abuse children for the jury to understand how child molesters often operate with a seduction technique, *see United States v. Romero*, 189 F.3d 576, 582, 585 (7th Cir. 1999). The testimony proposed here fits neatly within these margins.

Other federal courts have followed suit. In *United States v. Warren*, 774 F. Appx. 778, 782 (4th Cir. 2019) (*per curiam*), the court affirmed an expert's use to explain "the typical human trafficking experiences of its victims and the common behaviors of traffickers" in a prosecution for transporting a minor to engage in prostitution because it gave "context to the victim's testimony" and "aided the jury in better understanding some of the concepts and events described by the victim and in assessing the victim's credibility." *See also United States v. Alzanki*, 54 F.3d 994, 1006, 1009 (1st Cir. 1995) (affirming admission of expert testimony on the "behavior of abuse victims generally"); *Arcoren v. United States*, 929 F.2d 1235, 1240-41 (8th Cir. 1991) (affirming admission of expert testimony on battered woman syndrome); *cf. United States v. Johnson*, 916 F.3d 579, 583, 588 (7th Cir. 1999) (affirming use of expert testimony on the "habits, customs, and practices of drug dealers" to assist jury to "better evaluate whether [defendant's] firearm possession was consistent with and typical to the drug trade").

Mr. Jackson cites cases excluding certain "cultural experts" but only when the testimony proved unhelpful to the jury's function. For instance, in *United States v. Delgado*, 677 F. Appx. 84, 86-87 (3d Cir. 2017), the court affirmed the exclusion of expert testimony on the culture of pimping, the nature of enterprises associated with sex trafficking, victim vulnerabilities, the health care problems of

8

victims, the barriers to exiting, and multiple aspects of offender dynamics. The government never showed how it would help the jury determine guilt or whether the defendants transported minors for the purpose of a commercial sex act. *See also United States v. Abdush-Shakur*, 465 F.3d 458, 466-67 (10th Cir. 2006) (affirming exclusion of expert testimony on "culture of violence" in federal prisons because it would not assist the jury or "negate any of the elements of the charged crime"). Of course, in *Delgado*, the government wasn't called on to prove force, threats of force, fraud, or coercion that caused the alleged victim to engage in a commercial sex act, *see United States v. D'Ambrosio*, 2016 U.S. Dist. LEXIS 46980, 6 (M.D. Pa. Apr. 7, 2016), which remains at issue here; nor should its holding be read more broadly than that the district court had not abused its discretion, particularly when the district court—as noted by the Third Circuit on an unusual interlocutory appeal—had promised to revisit its ruling within the context of fact testimony at trial. The court doesn't find these cases persuasive here.

Quite in contrast, the proposed expert testimony will help the jury evaluate the alleged victim's credibility. *See Young*, 316 F.3d at 656-59. Without it, the jury would be left awash to understand the background of the alleged victim's accusations, as it ascribes possible motives and reasons for Mr. Jackson's alleged actions. There would be no way for the jury to determine whether the victim's "experiences were common, unique, or implausible." *Warren*, 774 F. Appx. at 782. The proposed testimony will explain concepts and dynamics to place the alleged victim's testimony in context—to understand it and then to evaluate whether it proves elements of the crimes here or not. *See Young*, 955 F.3d at 615-16. The testimony isn't being offered simply to inform jurors about the horrors of human trafficking, but to provide them with context to this alleged victim's experience. *See Warren*, 774 F. Appx. at 782. The proposed testimony aids the jury to decide issues of consequence, so it is relevant and helpful under Rule 702 and *Daubert*, 509 U.S. at 591.

There is likewise substantial probative value to this testimony. *See* Fed. R. Evid. 403; *Miller*, 688 F.3d at 327. The average juror will undoubtedly find this world of sex trafficking as foreign to the

juror's everyday experience. *See United States v. Mansoori*, 304 F.3d 635, 654 (7th Cir. 2002) (same conclusion for drug trafficking). The testimony will include disturbing content that may prove emotionally upsetting to a juror too, though no more so than the alleged victim's testimony to which it provides context. The proposed expert testimony doesn't invite needless speculation or stray, at least on his record, from what the jury will need to understand to decide this case. Mr. Jackson may crossexamine Ms. Kimmer at trial to clarify any misgivings the jury might have after listening to her testimony. At this time, the court cannot say any risk of prejudice, albeit present and real, substantially outweighs the testimony's probative value. The court denies the motion to exclude this opinion witness accordingly.

> D. *The Court Denies Mr. Jackson's Request to Exclude the Foreign Business Records from Skip the Games Based on 18 U.S.C. § 3505.*

Mr. Jackson moves to exclude photographs and records produced by Skip the Games, a Netherlands-based company hosting the skipthegames.eu website. The government intends to offer the photographs and records as foreign business records under 18 U.S.C. § 3505. Mr. Jackson says the records are inadmissible because the government improperly certified them. *See also* Fed. R. Evid. 803(6), 902.

The admissibility of foreign business records in criminal proceedings is governed by 18 U.S.C. § 3505. *See United States v. Klinzing*, 315 F.3d 803, 809 (7th Cir. 2003). To be admissible, a foreign business record must come with a "foreign certification" of its authenticity. 18 U.S.C. § 3505(a)(1). A foreign certification is "a written declaration made and signed in a foreign country by the custodian of a foreign record of regularly conducted activity or another qualified person that, if falsely made, would subject the maker to criminal penalty under the laws of that country." 18 U.S.C. § 3505(c)(2).

Subsection 3505(a)(1) lists several requirements for foreign certifications, but these aren't disputed here. Mr. Jackson instead argues that, though the certification says it was made "under penalties of perjury (or criminal punishment for false statement or false attestation)," it doesn't say it

was made under penalty of perjury or subject to criminal penalty under the laws of the Netherlands. His argument goes too far.

Though 18 U.S.C. § 3505 "does require certification as to the way in which the records were kept and some declaration that the record-provider would be punishable under the criminal laws of the foreign country should he provide a false statement, it does not require the use of a 'magic form' upon which the employee/record-provider of the foreign company must certify that he is aware that his answers come under penalty of perjury." *United States v. Strickland*, 935 F.2d 822, 830-31 (7th Cir. 1991) (admitting foreign bank documents when a government official afterward said the documents were made under penalty of perjury, though the documents themselves didn't attest to this fact).

The declaration here meets the statutory requirements: it was made and signed in the Netherlands by a custodian of foreign records of regularly conducted activity, and he signed it subject to the penalties of perjury or "criminal punishment for false statement or false attestation." There is little doubting that the custodian, signing and attesting to as much in the Netherlands, understood that his attestation was subject to his country's law. Mr. Jackson doesn't demonstrate that the declarant wouldn't be accountable to the Netherlands for a false statement. Section 3505 isn't "intended to add technical roadblocks to the admission of foreign records, but, rather, to streamline the admission of such records." *Id.* at 831. That is particularly true when the documents contain indicia of reliability— a common format, often replicated photographs, and the "skipthegames.eu" logo, slogan, and web address.

Mr. Jackson also says the court should exclude the certification because it indicates that the records are authenticated under Federal Rule of Evidence 902(11), which only applies to domestic records. He points out that Rule 902(12) applies to foreign records, but only in civil cases. He is quite right of course; but nothing demonstrates that the certification doesn't comply with 18 U.S.C. § 3505, and that's the statute of concern. *See Klinzing*, 315 F.3d at 809. The certification "further state[s]" it is

11

intended to satisfy Rule 902(11), but that unnecessary addition doesn't alter the certification's compliance with § 3505. The added statement about Rule 902(11) turns out to be mere surplusage and harmless. The court denies the request to exclude these foreign records accordingly.

> E. *The Court Denies In Part the Government's Motion to Permit a Therapy Dog to Accompany the Alleged Victim While on the Witness Stand, Though the Dog May Remain in Proximity to the Witness Outside the Jury's Eyesight.*

The government wants a certified therapy dog (Aspen) to accompany the alleged victim in court while she testifies. Mr. Jackson objects because the dog will create sympathy for the witness, unfairly increase her credibility, and cause the jury to conclude improperly that she has been traumatized by his alleged actions. This difficult question pits the alleged victim's emotional wellbeing against the defendant's right to be presumed innocent in a fair trial.

Therapy dogs may aid sexual assault victims. Benefits include decreased anxiety, reduced blood pressure, lower heart rate, decrease in depression, increased speech and memory functions, and heightened mental clarity. The use of therapy dogs in court is an emerging area of the law and one that has garnered academic attention. *See, e.g.*, Jessica L. Jones, *A Canine in the Courthouse? Trust Me, You Need One*, 42 Pa. Law. 50 (2020); Emily L. R. Thelwell, *Paws for Thought: A Controlled Study Investigating the Benefits of Interacting with a House-Trained Dog on University Students Mood and Anxiety*, MDPI Animals J. (Oct. 21, 2019), https://www.mdpi.com/2076-2615/9/10/846; Casey Holder, Comment, *All Dogs Go To Court: The Impact of Court Facility Dogs As Comfort For Child Witnesses on a Defendant's Right to a Fair Trial*, 50 Hous. L. Rev. 1155 (2013). Certain state courts have permitted therapy dogs in the courtroom, though frequently for minors. *See, e.g.*, *State v. Millis*, 391 P.3d 1225, 1233-35 (Ariz. Ct. App. 2017); *State v. Reyes*, 505 S.W.3d 890, 897 (Tenn. Crim. App. 2016); *State v. Dye*, 309 P.3d 1192, 1200 (Wash. 2013).

The United States Senate not too long ago passed a bill called the Courthouse Dogs Act—ostensibly still pending before the House of Representatives and referred to subcommittee—that

enables federal courts to allow licensed therapy dogs on their premises. *See* S. 1029, 116th Cong. (2019). This proposed law provides that a witness testifying before the court in a criminal proceeding may use a certified facility dog while on the stand if the witness applies for an order before the court. *See id.* § 2(b). It also requires the court to find that the dog is of certified quality and will aid the witness in providing testimony. *See id.* §§ (2)(c)(1)-(2). It also says the court "may make such orders as may be necessary to preserve the fairness of the proceeding, including imposing restrictions on, and instructing the jury regarding, the presence of the certified facility dog during the proceedings." *Id.* § 2(f). Of course, this bill has yet to be passed by Congress, if it even will, but it underscores the currency of this issue in modern day trials.

That said, the law takes seriously an accused's rights—and it must. Prior to conviction or vindication, the accused is protected by the "presumption of innocence," *Betterman v. Montana*, 136 S. Ct. 1609, 1614 (2016), the "bedrock[,] axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law," *Reed v. Ross*, 468 U.S. 1, 4 (1984) (internal quotations omitted). Mr. Jackson fears that the dog may create sympathy for the witness and increase her credibility, and that proves a legitimate risk here. Jurors would struggle to divorce the image of a therapy dog comforting its guardian—and a key witness—from the evidentiary issues they must decide. Of course, Mr. Jackson runs the opposite risk that the therapy dog's absence from the courtroom will fail to prevent the witness from an emotional breakdown, but that risk remains in many criminal trials involving victims.

The court has considered a middle ground that would permit the witness to have a therapy dog with her, albeit outside the jury's viewpoint or knowledge. That arrangement proves more untenable in a COVID-19 world in which the courtroom has been restaged in such a way that the witness (and any therapy dog at her feet) would remain within the eyesight of at least some jurors, and once within view of some it would be known by all.

The parties cite to two federal cases addressing whether therapy dogs may aid testifying victims in criminal trials. The government cites to *Spence v. Beard*, 2015 U.S. Dist. LEXIS 56280, 28-32 (S.D. Cal. Mar. 6, 2015), *report and recommendation adopted*, 2015 U.S. Dist. LEXIS 56271 (S.D. Cal. Apr. 29, 2015), where the court held in a petition for *habeas corpus* that a state court didn't err by allowing a child witness to use a dog. *Spence* noted that the Supreme Court has upheld the use of special procedures to protect child witnesses, *see id.* at 30, but that isn't the circumstance here; and deferential post-conviction review bears less on the separate procedural question of whether to allow a therapy dog in trial in the first place. Mr. Jackson cites to *United States v. Gardner*, 2016 U.S. Dist. LEXIS 132882, 18-21 (E.D. Mich. Sept. 28, 2016), where the court didn't allow an adult witness to use a dog. The court finds *Gardner* more persuasive on this record.

*Gardner* noted that it couldn't find "any federal district court cases where a canine advocate was permitted to aid a victim in testifying in front of a jury," nor any cases in state court "where a canine advocate was allowed to be present during the testimony of a witness over the age of 18 who lacked severe development disabilities." *Gardner*, 2016 U.S. Dist. LEXIS 132882 at 20. This court's independent review also turned up no such cases; and like *Gardner*, the court here declines to permit a canine advocate during trial testimony for an adult, albeit young at age 18 but still an adult, without a proper medical or therapeutic showing that the therapy dog is necessary or even heavily recommended.

Some courts have stressed measures to decrease the dog's visibility or risks of the jury's consideration. *See, e.g., Reyes*, 505 S.W.3d at 897 (allowing dog to be used for child victim's testimony when district court instructed jury that no inferences nor sympathy should result from the dog's presence); *Millis*, 391 P.3d at 1235 (permitting dog to sit beside victim in gallery but not at the witness stand because it would be less visible to the jury). To be sure, the court understands the emotional toll that the alleged victim may experience. Trials often generate strong emotions of many types.

14

Accordingly, the court will permit her to bring the therapy dog to the courthouse. The court will allow the therapy dog to be in relative proximity to the witness but out of the jury's eyesight and will defer logistics until the court discusses the medical or therapeutic need for it and the options with the parties at the final pretrial conference. The options to discuss include the space behind the current witness box (former jury box) or behind the courtroom altogether, dependent on the therapy dog's training and the medical or therapeutic need, mindful of the defendant's right to a fair trial.

Accordingly, the court DENIES Khalil Jackson's motions *in limine* (ECF 31, 50) and motion to exclude expert testimony (ECF 49) and DENIES IN PART the government's motion to permit a therapy dog in the courtroom while the alleged victim testifies (ECF 54), with the issue to be taken up further at the final pretrial conference. The therapy dog may be brought to the courthouse and remain with the alleged victim in relative proximity until and while she testifies, albeit outside the jury's eyesight. The court will take up the most recent motion *in limine*, filed two days ago, once fully briefed.

SO ORDERED.

April 22, 2021                                                    *s/ Damon R. Leichty*
                                                                  Judge, United States District Court